IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NETWORK MANAGING SOLUTIONS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 16-295-RGA |
| AT&T INC. and AT&T MOBILITY LLC, | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS AT&T INC. AND AT&T MOBILITY LLC'S
OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
COUNTS I AND III OF THE SECOND AMENDED COMPLAINT**

OF COUNSEL:
L. Norwood Jameson
Matthew S. Yungwirth
S. Neil Anderson
DUANE MORRIS LLP
1075 Peachtree St. NE
Suite 2000
Atlanta, GA 30309
(404) 253-6900

Joseph A. Powers
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1842

Christopher J. Tyson
Justus L. Getty
DUANE MORRIS LLP
505 9th Street NW
Suite 1000
Washington, DC 20004
(202) 776-7804

Dated:  March 8, 2017

John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
jcastellano@shawkeller.com
arussell@shawkeller.com
*Attorneys for Defendants*

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................2

        A.      The '213 and '688 Patents ........................................................................2

        B.      The Accused 3GPP Standard ...................................................................4

III.    ARGUMENT .........................................................................................................7

        A.      NMS Must Allege Enough Facts to State a Plausible Claim ...................7

        B.      A Standards-Based Infringement Allegation Must Encompass Every
                Implementation of the Accused Standard .................................................8

        C.      Practicing the 3G Fault Management Specifications Does Not Require
                Practicing the '688 and '213 Patent Claims ............................................9

                1.      The '688 and '213 Patent Claims Only Encompass One Possible Way
                        to Implement the Relevant Sections of the Standard ...................9

                2.      NMS' Original Allegations Further Demonstrate Why Its Current
                        Infringement Allegations Are Implausible ................................12

CONCLUSION.................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................................7, 8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................7, 8

*Dynacore Holdings Corp. v. U.S. Phillips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004)................................................................................8

*Fujitsu Ltd. v. Netgear Inc.,*
    620 F.3d 1321 (Fed. Cir. 2010).........................................................................8, 11

*In re Fisker Auto. Holdings, Inc.,*
    No. CV 13-2100-SLR, 2017 WL 492996 (D. Del. Feb. 7, 2017) ............................7

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,*
    998 F.2d 1192, 1196 (3d Cir. 1993) ........................................................................7

*Williamson v. Correct Care Sols. LLC,*
    890 F. Supp. 2d 487, 491 (D. Del. 2012) ................................................................7

**Federal Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 2

Fed. R. Civ. P. 8(a) ........................................................................................................7

## I.    INTRODUCTION

Plaintiff Network Managing Solutions, LLC ("NMS") asserts claims of patent infringement against AT&T, Inc.[1] and AT&T Mobility LLC (collectively "AT&T").  On February 3, 2017, the Court granted AT&T's motion to dismiss all of NMS's direct, indirect, and willful infringement claims and dismissed NMS's First Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  (D.I. 17).  Regarding NMS's direct infringement claims, the Court found that merely alleging that the 3rd Generation Partnership Project ("3GPP") Standards cover the four asserted patents[2] is "insufficient to plausibly allege that to practice the standard necessarily means that a defendant also practices the patent." (*Id*. at 3).

In response, NMS filed a Second Amended Complaint on February 22, 2017 that again alleges direct infringement of the four Patents-in-Suit by AT&T, but drops the claims of indirect infringement.  (D.I. 18).  NMS's renewed effort to state a claim for direct infringement of the '213 and '688 Patents, however, remains insufficient for at least the reason that the Second Amended Complaint does not and cannot plausibly allege that implementation of the identified cellular network standards requires that the implementer perform the claimed steps of:

- "transmitting from the agent to a respective manager a number of notifications having the requested alarm data along with at least one item of correlation information for assigning a respective request to the notifications" ('688 Patent at Cl. 1); and

---

[1] AT&T Inc. is and always has been only a holding company. As a holding company, AT&T Inc. conducts no business with the public and is not the proper entity for the conduct alleged in this case. AT&T Inc. does not design, make, use, sell, offer for sale or import any products. AT&T Inc. is, legally and factually, a separate entity that is distinct from its subsidiaries and affiliates. The proper corporate defendant in this case should be AT&T Mobility LLC. However, AT&T Inc. joins this Motion because it currently is a defendant in this case.

[2] U.S. Patent Nos. 6,351,213 (the "'213 Patent"), 6,420,968 (the "'968 Patent"), 6,728,688 (the "'688 Patent"), and 6,553,099 (the "'099 Patent") (collectively, the "Patents-in-Suit").

- "sending, from the agent to the at least one manager, correlation information for assigning a respective request to the at least one request notification with the alarm data." ('213 Patent at Cl. 1).

Accordingly, AT&T moves for dismissal of Counts I and III of the Second Amended Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted[3].

## II.     STATEMENT OF FACTS

NMS accuses AT&T of infringing the claims of the '213 and '688 Patents via the adoption of three specific technical standards released by 3GPP relating to network alarm management. (D.I. 17, ¶¶ 19, 24–26, 28).  NMS collectively refers to these three 3GPP technical standards (*i.e.*, TS 32.101,[4] TS 32.111-1,[5] and TS 32.111-2[6]) as the "3G Fault Management Specifications." (*Id.*, ¶ 19).  The 3G Fault Management Specifications are part of a broader set of 3G network fault management specifications that NMS collectively refers to as the "3G Fault Management Standard." (*Id.*, ¶ 22).

### A.  The '213 and '688 Patents

Although not formally related, the '213 and '688 Patents are closely connected and cover similar technology.  In fact, they are explicitly linked by the specification of the '213 Patent, which summarizes the disclosure of the earlier-filed '688 Patent (D.I. 17, Ex. A, 1, col. 1, ll. 49-67; *id.*, Ex. C, 1) and includes three identical paragraphs describing the state of the prior art, four identical figures, and the accompanying disclosure for such figures, from the '688 Patent specification.  (*Id.*,

---

[3] AT&T, Inc. and AT&T Mobility LLC have each concurrently filed a respective answer to Counts II and IV of the Second Amended Complaint.

[4] Ex. A to AT&T's Request for Judicial Notice ("RJN") filed concurrently herewith.

[5] Ex. B to RJN.

[6] Ex. C to RJN.

Ex. A, col. 1, ll. 13-48, Figures 1-4, col. 3, l. 54 – col. 9, l. 35; *id*., Ex. C, col. 1, ll. 12-47, Figures 1-4, col. 4, l. 54 – col. 9, l. 31).

Common portions of their specifications acknowledge that well-known network environments such as the standardized Telecommunications Management Network (TMN) defined a management hierarchy in which "managers" on a higher management level communicated with "agents" on a lower management level to exchange information regarding faults in the network.  (*Id*., Ex. C, col. 1, ll. 12-20; *id*., Ex. A, col. 1, ll. 13-21).  The patents also acknowledge that "fault management" was understood to be an important part of TMN management and that managers and agents needed to be on the same page, and thus have the same current alarm information, as often as possible. (*Id*., Ex. C, col. 1, ll. 21-38; *id*., Ex. A, col. 1, ll. 22-39).  The patents further acknowledge that alarm "realignments" were performed between managers and agents in the TMN "whenever a new connection is established after a connection has been terminated or after the agent or manager has been initialized."  (*Id*., Ex. C, col. 1, ll. 39-47; *id*., Ex. A, col. 1, ll. 40-48.)  The patents describe their invention as "optimizing" realignment procedures between agents and managers.  (*Id*., Ex. C, col. 1, l. 66 - Col. 2, l. 3; *id*., Ex. A, col. 2, ll. 1-5).

The claims of the '213 and '688 Patents are similarly directed to the "optimized" realignment procedures disclosed in the specifications.  In a nutshell, the claims require a tiered network environment of "managers" (annotated in red in figure below) and "agents" (annotated in purple in figure below) communicating on different management levels. (*Id*., Ex. C, col. 9, ll. 38-43; *id*. at Ex. A, col. 11, ll. 6-11).



 The claims "optimize" these prior art realignment procedures by having an agent include "correlation information" (CI) and alarm data in response notifications (annotated in purple) that the agent transmits to the manager.  (*Id.*, Ex. C, col. 9, ll. 47-50; *id.* at Ex. A, col. 11, ll. 15-18). This "correlation information" ties these agent-transmitted notifications (annotated in purple) to prior manager requests (annotated in red).   (*Id.*, Ex. C, col. 9, ll. 44-50; *id.* at Ex. A, col. 11, ll. 12-18).

**B.   The Accused 3GPP Standard**

In its Second Amended Complaint, NMS alleges that practicing the 3G Fault Management Specifications necessarily infringes claim 1 in both the '213 and '688 Patents. (D.I. 17, ¶¶ 26, 28). For context, the 3G Fault Management Specifications referenced in the Second Amended Complaint outline the principles and higher-level requirements for 3G network alarm management

and processes. (D.I. 17, ¶¶ 20, 22; TS 32.101, § 1; TS 32.111-1, § 1; TS 32.111-2, § 1; TS 32.150,[7] §§ 1, 4.1-4.1.2).  However, these high-level requirements cited by NMS ***do not dictate specific implementations***, which are addressed by lower-level standards.

Instead, the 3G Fault Management Standard specifies ***multiple, alternate ways to implement the requirements of the accused 3G Fault Management Specifications***.  Currently, the 3G Fault Management Specifications can be implemented by using one of two alternate solution sets  identified in Annex C of TS 32.101, *i.e.*, the Common Object Request Broker Architecture ("CORBA") or the Simple Object Access Protocol ("SOAP") implementations.[8] Alternately, implementers may elect to implement the 3G Fault Management Specifications using alternative protocols (*e.g.* SNMP) that are not specifically defined in solution sets by the standard.[9]

Notably, the 3G Fault Management Standard previously identified a fourth implementation option known as Common Management Information Protocol ("CMIP").  However, that option was cancelled in Release 7 of the 3G Fault Management Standard in 2007.  (TS 32.101, Annex F; TS 32.111-1 Annex A; TS 32.111-2, Annex F; TS 32-111.4[10] (cancelled)).  CMIP is important

---

[7] Ex. F to RJN, 3GPP TS 32.150 V8.3.0 (2009-03) 3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Telecommunication management; Integration Reference Point (IRP) concept and definitions (Release 8) ("TS 32.150").

[8] *See also id.,* §§ 5.2.3, 5.3, Annex A; Ex. D to RJN, 3GPP TS 32.111-3 V8.1.0 (2012-09) 3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Telecommunication management; Fault Management; Part 3: Alarm Integration Reference Point (IRP): Common Object Request Broker Architecture (CORBA) Solution Set (SS) (Release 8) ("TS 32.111-3"); Ex. E to RJN, 3GPP TS 32.111-7 V9.0.0 (2009-12) 3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Telecommunication management; Alarm Integration Reference Point (IRP): SOAP Solution Set (SS) (Release 8) ("TS 32.111-7").

[9] (TS 32.101, §§ 4.1.1, 5.3, Annex A, Annex C; TS 32.150, §§ 4.1.1, 4.4).

[10] Ex. G to RJN, 3GPP TS 32.111-4 V4.6.0 (2003-09) 3rd Generation Partnership Project; Technical Specification Group Services and System Aspects; Telecommunication management;

because it was cited in NMS's original Complaint and AT&T's incorrectly alleged compliance with the CMIP solution set was the basis for NMS's infringement theory.  (D.I. 1, ¶¶ 19, 24-25). NMS apparently believed that CMIP formed the basis for its infringement theory, but may have later learned that that this implementation option in the standard was cancelled and the CMIP reference was dropped in NMS's First and Second Amended Complaints.

The three currently available solutions sets for implementing the 3G Fault Management Specifications (*i.e.*, COBRA, SOAP or proprietary solutions) are relevant here because they provide multiple ways to retrieve current alarm information.  NMS fails to account for this and instead only alleges that the retrieval of alarm information according to the 3G Fault Management Specifications establishes that AT&T performs the claimed steps of [sending/transmitting] correlation information required by claims 1 of the '213 and '688 Patents.  (D.I. 17, ¶¶ 26, 28). However, the 3G Fault Management Specifications, namely § 5.3.1 as cited by NMS, merely specifies a permissible and conditional ***result*** that must be achieved without specifying ***how*** the implementer must achieve this result:

### 5.3.1    Retrieval of current alarm information on NM request

The present document defines a flexible, generic synchronization procedure, which fulfils the following requirements:

- The alarm information provided by means of the synchronization procedure shall be the same (at least for the mandatory parameters) as the information already available in the alarm list. The procedure shall be able to assign the received synchronization-alarm information to the correspondent requests, if several synchronization procedures triggered by one NM run at the same time.

(TS 32.111-1, 16.)  The specified result is the ability to assign received synchronization-alarm information to each corresponding manager request for such information *if* the manager simultaneously transmits multiple synchronization requests.  By comparison, the [sending/transmitting] correlation information step of the two asserted claims requires that agent

---

Fault Management (FM); Part 4: Alarm Integration Reference Point (IRP): Common Management Information Protocol (CMIP) Solution Set (SS) (Release 4) ("TS 32.111-4").

notifications are assigned to manager requests specifically by using correlation information included within the agent notifications.  (*See* §II.A *supra*).  In other words, the claims require the sending/transmitting of agent notifications that include correlation information, but the 3G Fault Management Specifications do not.

## III.  ARGUMENT

### A.  NMS Must Allege Enough Facts to State a Plausible Claim

Rule 8(a)(2) requires that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see* Fed. R. Civ. P. 8(a)(2).  Although Rule 8 does not require "detailed factual allegations," to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  AT&T respectfully submits that the Court is well aware of the standards for applying the *Iqbal-Twombly* standard, which also is set forth in detail in the Defendants' prior Motion to Dismiss.  (D.I. 8, 7-9.).  In applying this standard, the Court "may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference." *Williamson v. Correct Care Sols. LLC*, 890 F. Supp. 2d 487, 491 (D. Del. 2012).  Courts may also take judicial notice of "undisputedly authentic documents" if "the plaintiff's claims are based on [such] documents." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *In re Fisker Auto. Holdings, Inc.*, No. CV 13-2100-SLR, 2017 WL 492996, at *1 (D. Del. Feb. 7, 2017)[11].

---

[11] *See* AT&T's RJN.

**B.  A Standards-Based Infringement Allegation Must Encompass Every Implementation of the Accused Standard**

To satisfy the pleading requirements of *Twombly* and *Iqbal* in a standards-based case, the plaintiff must plausibly allege that practicing the standards *necessarily* means the defendant practices each and every element of the asserted claims of the Patents-in-Suit.  (D.I. 16, 3).  *See also Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).  The use of a standard in place of a specific product in an infringement analysis is appropriate "*[o]nly* in the situation where a patent covers *every possible implementation* of a standard." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1328 (Fed. Cir. 2010).  In other words, NMS is required to plausibly allege in this case that practicing the 3G Fault Management Specifications *always* results in infringement.  *Dynacore at 1272*; *Fujitsu*, 620 F.3d at 1327-28 (emphasis added).  The mere fact that the result specified in the standard *could possibly* be achieved in an infringing way is insufficient to plausibly allege that AT&T *necessarily* practices the claims by practicing the standard.  *Twombly*, 550 U.S. at 557; *Fujitsu*, 620 F.3d at 1328.

This is precisely the type of case where allegations of standards-based infringement should be addressed now, at the pleading stage, because NMS does not, and cannot, plausibly allege that the '213 Patent, nor the '688 Patent, covers every possible implementation of the 3G Fault Management Specifications.  *Twombly*, 550 U.S. at 558 ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'") (internal citations omitted); *Fujitsu*, 620 F.3d at 1328.

8

**C. Practicing the 3G Fault Management Specifications Does Not Require Practicing the '688 and '213 Patent Claims**

Even accepting NMS's allegations as true, NMS has not and cannot allege that AT&T necessarily [sends/transmits] correlation information as required by the asserted claims.

1. The '688 and '213 Patent Claims Only Relate to One Possible Way to Implement the Relevant Sections of the Standard

NMS alleges that the [sending/transmitting] correlation information step is satisfied by § 5.3.1 of TS 32.111-1 and § 6.3.2 of TS 32.111-2 of the 3G Fault Management Specifications. (D.I. 17, ¶¶ 26, 28).  Specifically, NMS alleges, in relevant part:

> [I]n reference to claim 1 of the '213 Patent, the aforementioned Fault Management Standard requires . . . (iii) following receipt of the request notification, the NE sends to the NM information to enable the NM to know which reported alarm data corresponds to which synchronization request notification (TS 32.111-1, at § 5.3.1; TS 32.111-2, at § 6.3.2) ("sending, from the agent to the at least one manager, correlation information for assigning a respective request to the at least one request notification with the alarm data")  (D.I. 17, ¶26);

> [I]n reference to claim 1 of the '688 Patent, the aforementioned Fault Management Standard requires . . . (iv) following receipt of the request notifications from its respective NMs, the NE sends to an NM information to enable the NM to know which reported alarm data corresponds to which synchronization request notification (TS 32.111-1, at § 5.3.1; TS 32.111-2, at § 6.3.2) ("transmitting from the agent to a respective manager a number of notifications having the requested alarm data along with at least one item of correlation information for assigning a respective request to the notifications") (*id.*, ¶28).

However, the 3G Fault Management Standard (annotated excerpt below) merely specifies a permissible and conditional ***result*** without specifying ***how*** a company must operate its network to achieve this ***result***:

## 5.3.1    Retrieval of current alarm information on NM request

The present document defines a flexible, generic synchronization procedure, which fulfils the following requirements:

- The alarm information provided by means of the synchronization procedure shall be the same (at least for the mandatory parameters) as the information already available in the alarm list. The procedure shall be able to assign the received synchronization-alarm information to the correspondent requests, if several synchronization procedures triggered by one NM run at the same time.

(TS 32.111-1, 16.)  Indeed, the relevant portion of the standard specifies a permissible *result*—the assignment of received synchronization-alarm information to correspondent requests—that must be achieved *if* (and only if) a particular *condition*—several synchronization procedures are simultaneously triggered by one network manager (NM)—occurs in the implemented fault management network.  (*Id*.)  This approach is consistent with the stated intent of this section of the 3GPP standard: to define a "flexible, generic synchronization procedure."  (*Id*.)  By doing so, the standard gives operators the flexibility of choosing whether to even permit a single NM to trigger multiple synchronization procedures simultaneously in their network.  If an operator chooses *not* to implement this feature, it could practice the standard without ever achieving this stated result.  For example, an agent, rather than an NM, could be responsible for triggering synchronization procedures (*i.e.*, in a "push" rather than a "pull" system).  In this example, the implemented system would not have a "correspondent [synchronization] request" to which "received synchronization-alarm information" would need to be assigned.

As a second example, an operator could employ redundant NMs such that agents always had connectivity with at least one NM and synchronization procedures were only performed between NMs (*i.e.*, at the same management tier).  Notably, the other section of the standard cited by NMS for this claim element (§ 6.3.2 of TS 32.111-2), and both the CORBA (TS 32.111-3) and SOAP (TS 32.111.7) solution sets for implementing the 3G Fault Management Specifications, are wholly silent regarding parallel or simultaneous synchronization procedures triggered by one NM.

Furthermore, if an operator chose to permit a single NM to trigger multiple synchronization procedures simultaneously in their network, the standard also leaves the choice of ***how*** to achieve the specified result completely up to the operator.  Indeed, there could be countless ways to achieve this same result.  For example, each synchronization request sent by the NM to various agents could specify a different response time window such that the time of receipt could be used to assign received alarm data to correspondent requests.  Additionally, by way of example, the manager and each agent could negotiate or exchange encryption keys such that successful encryption and decryption of responses and notifications would enable assigning received alarm data to correspondent requests.

By comparison, the claimed step of each claim requires that the Agent send/transmit "correlation information" (CI) within its notifications (Notifications 1 and 2) to the Manager to enable assignment of such notifications to the Manager's prior request.  (*See* step (2) annotated in purple in figure in §II.A *supra*).  In other words, the step requires: (a) the transmission of a specific type of information within messages *from the Agent to the Manager* and (b) assigning these Agent-transmitted messages to the Manager's prior request *using this specific type of information*.  (*Id.*) Nothing in the cited 3G Fault Management Specifications requires that this particular technique be performed.  It therefore is not surprising that NMS has not mapped the specific action required by the claims to any description of any implementation of simultaneous or parallel synchronization requests, or to any specific type of information sent from an agent to a manager, in the 3G Fault Management Standard including in any current solution set.  Simply because an implementer *could possibly* achieve the result required by the standard by using the claim steps is insufficient for NMS to plausibly allege that AT&T *necessarily* practices the claims by practicing the 3G Fault Management Specifications.  *Fujitsu*, 620 F.3d at 1327-28.

11

2.  NMS' Original Allegations Further Demonstrate Why Its Current Infringement Allegations Are Implausible

NMS originally alleged, albeit in a threadbare fashion, that AT&T infringed the claims of the '688 and '213 Patents by practicing the 3G Fault Management Specifications using the CMIP solution set. (D.I. 1, ¶¶ 19, 24-25).  At the pleading stage, alleging that compliance with the CMIP solution set standard (TS 32.111-4) could plausibly state a claim (putting aside issues of invalidity and claim construction) because the CMIP solution set (TS 32.111-2, 16) provides that:

- After evaluation of the request, the Agent first generates an *alignmentId* value, which unambiguously identifies this alignment process. This value is used by the Manager to correlate alarm reports to the corresponding alignment requests, in case this Manager issues several alarm alignments in parallel.

(TS 32.111-4, 9).  However, 3GPP *discontinued* CMIP as a solution set in *2007* (TS 32.101, Annex F; TS 32.111-1 Annex A; TS 32.111-2, Annex F) and NMS is well aware that AT&T's network does not comply with CMIP.  Apparently realizing that its infringement allegations hinged on a solution set that had been discontinued almost a decade earlier and was not practiced by AT&T, NMS deleted references to CMIP the following day in its First Amended Complaint. (D.I. 4, ¶ 19). Notably, NMS's allegations since that original Complaint fail to cite to any section of the solution sets (CORBA, SOAP) included in the current 3G Fault Management Standard. (TS 32.111-3, TS 32.111-5, TS 32.111-7).  Nor do any of its allegations cite to any section of any standards documents describing fault management implementation in alternative protocols (e.g. SNMP).

This is not an oversight by NMS.  Rather, NMS clearly hopes that its "smoke and mirrors" infringement theory will survive long enough to somehow convince AT&T to pay a nuisance settlement rather than expend more of its valuable time and resources. However, at least for the '688 and '213 Patents, NMS should not be permitted another day in this Court.

## **CONCLUSION**

For the foregoing reasons, AT&T respectfully requests that the Court dismiss Counts I and

III of Network Managing Solutions' Second Amended Complaint with prejudice.

                                                    Respectfully submitted,

                                                    */s/ Andrew E. Russell*
OF COUNSEL:                                         John W. Shaw (No. 3362)
L. Norwood Jameson                                  Jeffrey T. Castellano (No. 4837)
Matthew S. Yungwirth                                Andrew E. Russell (No. 5382)
S. Neil Anderson                                    SHAW KELLER LLP
DUANE MORRIS LLP                                    300 Delaware Avenue, Suite 1120
1075 Peachtree St. NE                               Wilmington, DE 19801
Suite 2000                                          (302) 298-0700
Atlanta, GA 30309                                   jshaw@shawkeller.com
(404) 253-6900                                      jcastellano@shawkeller.com
                                                    arussell@shawkeller.com
Joseph A. Powers                                    *Attorneys for Defendants*
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1842

Christopher J. Tyson
Justus L. Getty
DUANE MORRIS LLP
505 9th Street NW
Suite 1000
Washington, DC 20004
(202) 776-7804

Dated:  March 8, 2017

13